UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
LEON SMITH,                          : 05 Civ. 5485 (BSJ)(JCF)
                                     :
            Petitioner,              :        REPORT AND
                                     :        RECOMMENDATION
      - against -                    :
                                     :
BRIAN FISCHER, SUPERINTENDENT        :
SING SING CORRECTIONAL FACILITY,     :
                                     :
            Respondent.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:

A fair criminal trial presumes a mentally competent defendant. Consequently, a trial court is sometimes obligated to trigger a competency inquiry even in the absence of a request by defense counsel. This is such a case.

Leon Smith brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in New York State Supreme Court, New York County, for robbery in the second degree. In his petition, Mr. Smith alleges that (1) the trial court violated his due process rights by failing to order a competency hearing sua sponte; (2) his counsel was ineffective for failing to request a competency examination; and (3) the jury instructions violated due process by improperly relieving the prosecution of the burden of proving an element of the crime. For the reasons set forth below, I recommend that the petition be granted.

<u>Background</u>

On December 26, 1996, Leon Smith ran into the 32nd Precinct in Manhattan claiming that there were spaceships outside, that his feet were on fire, and that Martians were chasing him. (Harlem Hospital Records, attached as Exh. F to Petition For a Writ of Habeas Corpus by a Person in State Custody ("Petition"), at 8). Police officers escorted Mr. Smith to Harlem Hospital where he was admitted to the psychiatric unit.  Three days later, on December 29, the hospital released him. (Petition, Exh. F at 23).  After his release, Mr. Smith began a binge during which he consumed crack cocaine, LSD, and PCP.  (Tr. at 133-35).[1]  On January 2, after being awake for more than a day and beginning to hallucinate, Mr. Smith decided to take the subway back to the 32nd Precinct to obtain help.  (Tr. at 134, 136).  While on the subway platform, the petitioner attacked Odilon Morais and took his wallet.  (Tr. at 137-39).  Mr. Smith was charged with robbery in the second degree, forcibly stealing property, and causing physical injury. (Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet. Brief") at 1).

Before trial, Mr. Smith's attorney, Howard Meyer, engaged a psychiatrist, Dr. Robert Lloyd Goldstein, M.D., a Clinical Professor of Psychiatry at Columbia University, to examine Mr. Smith and lay the groundwork for a defense of not guilty by reason

_____

[1] "Tr." refers to the trial transcript.

2

of insanity. Dr. Goldstein conducted a comprehensive examination and reviewed Mr. Smith's medical records, including documentation of several inpatient psychiatric hospitalizations. (Letter of Robert Lloyd Goldstein, M.D., dated Aug. 27, 1997 ("Goldstein Letter"), attached as Exh. G to Petition, at 1, 4).

Dr. Goldstein concluded that Mr. Smith suffered from a "psychotic illness" characterized by "prominent delusions and hallucinations" and "grossly-impaired reality testing." (Goldstein Letter at 3-4). In particular, Dr. Goldstein reported that, during the acute phases of the psychiatric disorder, Mr. Smith experienced extreme paranoia and heard voices telling him to harm himself or others. (Goldstein Letter at 3, 4).

Dr. Goldstein did not opine on the petitioner's competency to stand trial but reported that he was not acutely psychotic at the time of the evaluation. (Goldstein Letter at 3). Dr. Goldstein did observe that Mr. Smith was "markedly anxious and depressed," and "socially isolated and withdrawn," and, although the petitioner was no longer suicidal at the time of the evaluation, Dr. Goldstein noted that he had attempted suicide more than once in the past. (Goldstein Letter at 2-3). Finally, Dr. Goldstein concluded that Mr. Smith was severely learning disabled, appeared to suffer from mild organic brain damage, exhibited "rambling and somewhat disorganized" speech patterns, and could barely read or write. (Goldstein Letter at 1-2).

Not surprisingly, Mr. Meyer found it difficult to counsel his client on legal matters related to the defense.  As Mr. Meyer represented in an affidavit filed to obtain reimbursement for legal services, the petitioner "was a difficult client with psychiatric problems and only marginally fit to proceed to trial.  Thus, many hours were spent with the defendant explaining the charges and possible defense."  (Affirmation of Howard R. Meyer dated Feb. 14, 1998, attached as Exh. K to Petition, ¶ 2).  Mr. Meyer did not raise with the trial court the issue of Mr. Smith's competency.

The trial began on December 3, 1997.  Mr. Meyer planned to call Dr. Goldstein as an expert witness to prove that Mr. Smith was severely paranoid and delusional at the time of the crime and therefore not guilty by reason of insanity.  (Tr. at 14-17).  After two days of testimony by prosecution witnesses, Mr. Meyer changed course and decided instead to put Mr. Smith on the stand.  As Mr. Meyer later explained, he was motivated, in part, by a belief that Mr. Smith would provide the jury with convincing evidence of mental illness. (H. at 60-61).[2]

Certainly, Mr. Smith's testimony at trial was rambling and volatile.  Overwhelmed by sadness at one point, he started crying as his lawyer took him through his interrogation at the police station.

_____

[2] "H." refers to the transcript of a post-conviction hearing held on April 1, 2003, in New York State Supreme Court to address Mr. Smith's motion to set aside his conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10.

LEON SMITH: And he said he is going to –– he know the D.A.  If I help him with these pictures he going to show me when he go to the Tombs, that the detectives will come and take me out of the Tombs and he wants me to point out some drug areas ––

HOWARD MEYER: Okay ––

SMITH: And everything.  He said we going to help you and put you in a program for 18 months.  That's the God's honest truth, everybody, man ––

THE COURT: Wait for the next question.

SMITH: (Cont'g) I started crying, because I thought he was telling me the truth, man.  My problems is drugs, man.

MEYER: Okay, Mr. Ragin, Mr. Ragin,[3] let me ask you this –– calm down, okay, take it easy.  Take it easy.

(Tr. at 191).

Mr. Smith's testimony was also circuitous and difficult to bring under control.  When the prosecutor asked Mr. Smith how long he had been in the hospital, for example, the judge intervened to end Mr. Smith's convoluted and repetitious answer.

THOMAS ROTKO: How long were you in the hospital for?

SMITH: I was in the hospital for exactly - I spent the night.  I woked up in pajamas.  I spent the night, like two, three days.  I remember eating time.  I get up and I slept and everything.  I remember when I asked the doctor that I don't want to go back out there because I feel safe.  I remember the next day ––

THE COURT:  Two days. Stop.

(Tr. at 168).  The court interrupted Mr. Smith in at least forty-

_____

[3] Mr. Smith had explained to the jury that his real name was Arthur Ragin, not Leon Smith, the name he gave the police when he was arrested.  (Tr. at 121).

5

three similar instances to focus him on the question posed, cut short an answer, or ask him to wait for a question before rambling on. (Tr. at 122, 125, 129, 130, 132, 133, 134, 135, 136, 137, 139, 143, 144, 146, 148, 150-51, 152, 153, 158, 160, 163, 168, 169, 170, 171, 175, 176, 177, 179, 182, 190, 191, 194).

The prosecution called three witnesses: the victim, Mr. Morais; Officer Julio Castro, one of the arresting officers; and a subway rider, Michael Nared, who was on a train that pulled into the subway station as the incident unfolded. From the train, Mr. Nared saw Mr. Smith attacking Mr. Morais. (Tr. at 61-63). According to Mr. Nared, he got off the train and grabbed hold of Mr. Smith, allowing Mr. Morais to slip out of the struggle. (Tr. at 64). Then, Mr. Nared testified, he pushed Mr. Smith up against a wall to subdue him, at which point Mr. Smith blurted, "What are you doing? Why are you doing this to me, brother? Chill, you know, we can split this. Just let me go. I'm not trying to go back to jail." (Tr. at 66). Mr. Nared testified that a Transit Authority porter then joined him in restraining Mr. Smith until the police arrived. (Tr. at 68-69). The victim was standing somewhere behind Mr. Nared, out of sight. (Tr. 69).

Officer Castro's testimony differed from Mr. Nared's. In the officer's account, Mr. Smith and the victim were struggling when the police came on the scene, but Mr. Nared was standing off to the side, three to five feet from the tussle. (Tr. at 105-07). The officers pulled Mr. Smith off the victim. (Tr. at 94, 97).

6

Officer Castro then spoke with Mr. Nared for five or ten minutes to get his account of what had happened. (Tr. at 97, 108). Mr. Nared did not mention Mr. Smith's offer to split the proceeds (Tr. at 107-09), and no other witness heard the alleged offer. (H. at 67-68).

At the conclusion of the trial, the judge instructed the jury regarding both the crime of robbery and the affirmative defense of legal insanity. (Tr2. at 65-98).[4] The jury found Mr. Smith guilty of robbery in the second degree, and he was sentenced as a persistent violent felony offender to an indeterminate term of sixteen years to life imprisonment. (S. at 12, 15).[5]

On March 7, 2001, the petitioner moved to vacate the judgment pursuant to CPL § 440.10, arguing, among other things, that Mr. Meyer did not provide effective assistance of counsel because he failed to call Dr. Goldstein as a witness and failed to request a competency inquiry. (Brief for Defendant-Appellant ("Def. App. Brief"), attached as Exh. A to Petition, at 16-17).[6] The trial court denied the § 440.10 motion without a hearing, observing that

---

[4] "Tr2." refers to the transcript of the last day of trial, which is paginated separately from the rest of the trial transcript.

[5] "S." refers to the transcript of the sentencing hearing.

[6] Dr. Goldstein stated in an affidavit attached to the petitioner's CPL § 440.10 motion, "I was never asked to attend court. Mr. Meyer never contacted me to schedule my appearance in court or to prepare my testimony. I was unaware that a trial was scheduled and in fact proceeded." (Def. App. Brief at 13 n.12).

Mr. Meyer's failure to call Dr. Goldstein as a witness was a justifiable trial strategy because Mr. Smith himself was available to testify about his delusion of being chased by Martians and to demonstrate his mental status to the jury. Summing up the impact of Mr. Meyer's strategy, the judge wrote that Mr. Smith's appearance on the stand, together with hospital records, provided the best possible proof of his mental illness at the time of the crime.

> As the trial judge, I observed that the defendant's testimony regarding the [Martian] incident as well as his testimony as to the robbery, revealed extremely volatile behavior, slurred, rambling speech, and an inability to intelligibly respond to questions on direct and cross-examination. . . . Given the defendant's insanity defense, there was no better proof of his state of mind than his own testimony and the hospital records corroborating the earlier incident.

People v. Smith, Index No. 213/97 (N.Y. Sup. Ct. July 27, 2001 (unpublished opinion), attached as Exh. M to Petition ("7/27/01 Order"), at 4).

On January 30, 2003, the Appellate Division, First Department, consolidated Mr. Smith's § 440.10 appeal and his direct appeal. It reversed the trial court on the issue of Mr. Meyer's failure to call Dr. Goldstein as a witness, noting that the record reflected a factual discrepancy concerning the basis for Mr. Meyer's decision, and remanded that issue for a hearing and further determination. People v. Smith, 301 A.D.2d 471, 473, 755 N.Y.S.2d 31, 32 (1st Dep't 2003). On the other claims in the § 440.10 motion, including Mr. Smith's assertion that Mr. Meyer was

ineffective because he failed to seek a competency inquiry, the appellate court affirmed the trial judge's decision. Finally, the court held the petitioner's direct appeal of the underlying conviction in abeyance pending the trial court's further determination on the § 440.10 motion. Id. at 473, 755 N.Y.S.2d at 32.

At the post-conviction hearing, Mr. Meyer explained that he had ruled out calling Dr. Goldstein after Mr. Nared had testified because he had been concerned that Mr. Nared's rendition of the events -- specifically that Mr. Smith had offered to split the proceeds of the robbery with him -- might have caused Dr. Goldstein to abandon his opinion that Mr. Smith was psychotic at the time of the crime. (H. at 54-56). Mr. Meyer also said it was precisely because he knew Mr. Smith's testimony would be rambling and disorganized that he had called his client to the stand. (H. at 13-14). Mr. Meyer explained that he had found Mr. Smith's manifestations of mental illness credible and assumed a jury would as well.

> THE COURT: When you say you thought he was credible, would it be more accurate to say you thought he would be convincing?
>
> MR. MEYER: When I say that, in other words, I was not looking for a rational, coherent witness. I was looking for a man who appeared to have a mental illness. That's why I, in spite of the misgivings I've heard in this courtroom as calling him a witness, I thought he would

> present himself as a persuasive, credible[7] witness with
> respect to a man who has a serious mental illness.  The
> ramblings and the fantasies and all that came out during
> the course of the trial through his testimony, which I
> thought was quite persuasive.

(H. at 60-61).

At the end of the hearing, the judge, who had presided over

Mr. Smith's trial, offered this view:

> What was the offer of proof on this witness?  Let's be
> honest.  The offer of proof on this witness was, "listen
> to him and in summation I'm going to tell you this man is
> delusional."  And to tell you the truth, speaking out of
> place, maybe, that witness was pretty darn convincing to
> this jury.  Exhibit A [Mr. Smith] was a very compelling
> argument of delusion.

(H. at 105).

The court denied the petitioner's § 440.10 motion for a second

time.  People v. Smith, Index No. 213/97 (N.Y. Sup. Ct. Sept. 29,

2003) (unpublished opinion), attached as Exh. M to Declaration of

Alyson Gill dated Nov. 28, 2005 ("Gill Decl.")).  Following the

court's dismissal of the § 440.10 motion, the petitioner filed a

supplemental brief on his direct appeal alleging that counsel was

ineffective for failing to call a psychiatrist as an expert witness

and failing to request a competency inquiry, and that the trial

court erred by failing to order a competency hearing sua sponte.

(Supplemental Brief for Defendant Appellant ("Def. Supp. Br."),

attached as Exh. B to Petition).

---

[7] The transcript reads "incredible" but this appears to be
transcription error because the comment comes in the midst of Mr.
Meyer's argument that he believed a jury would find Mr. Smith
persuasive with respect to his claim of insanity.

The Appellate Division unanimously affirmed the petitioner's conviction and the denial of his § 440.10 motion, ruling that Mr. Smith received meaningful representation, that a competency inquiry was not required, and that the court's jury charge did not shift the burden of proof. <u>People v. Smith</u>, 4 A.D.3d 163, 772 N.Y.S.2d 34, 35 (1st Dep't 2004). The petitioner's request for leave to appeal to the New York Court of Appeals was denied on June 10, 2004. Mr. Smith then filed the instant petition.

Mr. Smith argues that he is entitled to habeas relief because the trial court, having acknowledged doubts about his capacity to engage in rational thinking, was under a constitutional obligation to order an inquiry into his competency. The petitioner further asserts that his lawyer, who testified at the post-conviction hearing to having strong doubts about his rationality, failed to provide meaningful counsel because he allowed the trial to proceed without a competency determination. Finally, Mr. Smith contends that the court's jury instructions unconstitutionally shifted the burden of proof.[8]

<u>Discussion</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner only where the state court's

---

[8] The respondent has stipulated that Mr. Smith has exhausted all state court remedies. (Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus at 13).

adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000)(O'Connor, J., concurring). Under the "unreasonable application" prong, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Congress chose the term "unreasonable," not "erroneous" or "incorrect" to modify "application." 28 U.S.C. 2254(d)(1); see Williams, 529 U.S. at 411. Thus, it follows that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411.

    A.   Trial Court's Obligation

    The Supreme Court has repeatedly recognized that the criminal

trial of an incompetent person violates the Due Process Clause of the Fourteenth Amendment. <u>Medina v. California</u>, 505 U.S. 437, 453 (1992) (citing cases). In particular, "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." <u>Drope v. Missouri</u>, 420 U.S. 162, 172 (1975).[9] "[I]n the event a sufficient doubt exists," due process demands that the trial court conduct an inquiry into the defendant's competence. <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966); <u>see also Cooper v. Oklahoma</u>, 517 U.S. 162, 172 (1996); <u>Medina</u>, 505 U.S. at 445.

Habeas relief is warranted when doubt regarding a defendant's competence existed at trial and the trial court failed to order -- on its own motion, if necessary -- an inquiry into the defendant's fitness for trial. <u>Pate</u>, 383 U.S. at 385. The crux of such a procedural due process violation is not the defendant's actual incapacity but the court's doubt concerning his competence. <u>Pate</u>, 383 U.S. at 369 ("In the event a sufficient doubt exists . . . such a hearing must be held."); <u>Silverstein v. Henderson</u>, 706 F.2d 361, 369 (2d Cir. 1983) (The "trial court must order a hearing when

---

[9] Four United States Courts of Appeals expressly distinguish between procedural and substantive due process rights when analyzing a defendant's competency claim. <u>See</u> <u>Williams v. Woodford</u>, 384 F.3d 567, 603-04, 608 (9th Cir. 2004); <u>Walton v. Angelone</u>, 321 F.3d 442, 459-60 (4th Cir. 2003); <u>Gilbert v. Mullin</u>, 302 F.3d 1166, 1178 (10th Cir. 2002); <u>Oats v. Singletary</u>, 141 F.3d 1018, 1026 n.19 (11th Cir. 1998).

there is reasonable ground for believing that the defendant <u>may be</u> incompetent to stand trial.") (emphasis added and internal quotation marks omitted). A finding of competence early in the pendency of a case does not absolve the court of its obligation: "[e]ven when a defendant is competent at the commencement of his trial," the court must remain vigilant to evidence suggesting the emergence of incompetence. <u>Drope</u>, 420 U.S. at 181.

Competency is the "sufficient present ability to consult with [one's] lawyer with a reasonable degree of rational understanding [including] a rational as well as factual understanding of the proceedings." <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960). Noting that there are "no fixed or immutable signs," the Supreme Court has declined to proscribe a single standard for assessing whether a trial court should have conducted an inquiry into the defendant's competence. <u>Drope</u>, 420 U.S. at 180. Reviewing courts consider the indicia of incompetence that were before the trial judge, which may include a defendant's history of erratic or irrational behavior, <u>Pate</u>, 383 U.S. at 378-81, bizarre courtroom conduct, <u>Cooper</u>, 517 U.S. at 351-53, defense counsel's expressions of doubt about the client's competence, <u>Drope</u>, 20 U.S. at 178 n.13; <u>Harris v. Kuhlmann</u>, 346 F.3d 330, 336 (2d Cir. 2003), or medical reports, <u>Silverstein</u>, 706 F.2d at 362-63. <u>See also</u> <u>Johnson v. Keane</u>, 974 F. Supp. 225, 231 (S.D.N.Y. 1997) (listing factors to be considered by trial court). Certainly, a judge's finding that a

defendant is irrational and delusional at trial is strong evidence that the judge had sufficient doubt about the defendant's competency.

In this case, the trial court had more than ample opportunity to observe the defendant and develop concerns about his competency. As both the court and defense counsel noted, Mr. Smith took the stand in support of his insanity defense not only to provide information about the hallucinations he experienced just before his arrest, but also to demonstrate his mental illness for the jury. Although the trial judge did not have occasion to determine formally the question of competence because defense counsel never raised the issue, the judge did conclude after hearing the testimony that Mr. Smith was incoherent and unintelligible -- compelling proof of a mental illness. (7/27/01 Order at 4; H. at 105). Particularly given the medical records documenting Mr. Smith's multiple psychiatric hospitalizations and his history of florid hallucinations, the court's finding that Mr. Smith was delusional and irrational on the witness stand gave rise to a constitutional obligation to order further inquiry into the petitioner's competence. The appropriate vehicle would have been an examination under § 730 of the Criminal Procedure Law. See Silverstein, 706 F.2d at 367.

The Appellate Division's rejection of Mr. Smith's claim rests on an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court. The

Appellate Division decided that the trial court was not compelled to order a mental competency exam unless it actually "viewed [the] defendant as incompetent at the time of the trial." People v. Smith, 4 A.D.3d at 165, 722 N.Y.S.2d at 35.  But the standard established by the Supreme Court demands an inquiry into the defendant's fitness for trial whenever there is a sufficient doubt about the defendant's competence; it does not require an actual finding of incompetence prior to ordering the hearing.  The Supreme Court has emphasized that the right not to be tried while legally incompetent is fundamental to our legal system:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

Cooper, 517 U.S. at 354 (quoting Riggins v. Nevada, 504 U.S. 127, 139-40 (1992)(Kennedy, J. concurring)). The Court has repeatedly noted that this right is deeply rooted in the Anglo-America legal tradition.  See Cooper, 517 U.S. at 356 (mentioning, among others, a 1685 case in which the trial court "incurred 'censure' for proceeding to trial with a doubt as to the defendant's competence"); see also Drope, 410 U.S. 171 (discussing reasons for "common-law prohibition" on trial of incompetent persons); Medina, 505 U.S. at 446 ("The rule that a criminal defendant who is incompetent should not be required to stand trial has deep roots in our common-law heritage.").  The Appellate Division's application

of the law ran contrary to these deep-seated protections as defined by the Supreme Court of the United States.

    B.    Ineffective Assistance of Counsel

Mr. Smith also claims that his trial lawyer, Mr. Meyer, was ineffective because he did not request a competency hearing despite the petitioner's apparent mental illness. Whether the state court's rejection of this claim represents an objectively unreasonable application of clearly established federal law is a closer question. Because Mr. Smith's habeas petition should be granted on other grounds, it is not necessary to resolve this issue.

The applicable federal law is the two-pronged standard set forth in Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to demonstrate, first, that counsel's performance was so defective that it "fell below an objective standard of reasonableness," id. at 688, and, second, that the outcome of trial would have been different but for the lawyer's performance, id. at 694. A court may grant a habeas petition even if the petitioner's particular theory of ineffectiveness has not been addressed by the Supreme Court. "[F]or AEDPA purposes, it matters only that the Strickland performance and prejudice test has been 'clearly established' [] not that a particular theory of ineffective assistance derived from Strickland has been clearly established." Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

To locate the dividing line between reasonable and

unreasonable practice by counsel, the Supreme Court has often turned to American Bar Association practice standards for guidance. See, e.g., Wiggins v. Smith, 539 U.S. 510, 524 (2003) (noting that Supreme Court has "long [referred to ABA standards' as 'guides to determining what is reasonable.'"); Williams, 529 U.S. at 396; Strickland, 466 U.S. at 688. ABA principles provide that when a lawyer has a "good faith doubt" about a client's competency, the lawyer "should move for evaluation of the defendant's competence to stand trial." ABA Criminal Justice Standard 7-4.2(c). The ABA standard provides more leeway for counsel to proceed despite doubts about a defendant's competence than the due process standard allows the trial judge. ABA commentary notes that a lawyer may refrain from seeking a competency examination if avoiding an inquiry will advance a client's best interests. A lawyer in consultation with his or her client may properly proceed to trial if, for example, acquittal is likely and the consequences attending a finding of incompetence are likely to be severe. ABA Criminal Justice Standard 7-4.2 cmt.

To determine whether a lawyer's performance falls below the prevailing norm, courts analyze the lawyer's own assessment of the defendant, the evidence of the defendant's mental state, and the lawyer's legal actions. See Walton, 321 F.3d at 461 (counsel effective where he documented information concerning defendant's mental health and pursued medical evaluations that led to court-ordered competency evaluation but eventually made strategic

decision not to raise competency issue); <u>Castrillo v. Breslin</u>, No. 01 Civ. 11284, 2005 WL 2792399, at *3, 15-16 (S.D.N.Y. Oct. 26, 2005)(where defendant did not appear to attorney to be mentally ill, counsel was not ineffective for failing to request competency exam, despite medical evidence of head injuries); <u>People v. Sinatra</u>, 89 A.D.2d 913, 914-15, 453 N.Y.S.2d 729, 731-32 (2d Dep't 1982) (counsel ineffective where defendant "either asleep or high on something" throughout proceeding and counsel failed to seek examination).

In this case, it is difficult to ascertain Mr. Meyer's assessment of his client's capacity. Mr. Meyer filed two affirmations suggesting that he believed Mr. Smith was at least marginally competent to stand trial.[10] Yet, he contradicted these statements when he testified concerning his decision to keep Dr. Goldstein off the stand. At the hearing, Mr. Meyer argued that his client was delusional and irrational during the trial. He did not address any strategic evaluation he might have made of the possibility of seeking a competency examination.

The Appellate Division rejected the ineffectiveness of counsel claim during the first appeal and before the hearing took place.

---

[10] In one, the affirmation filed to obtain attorneys' fees, Mr. Meyer stated that he found Mr. Smith marginally fit for trial. In the other, in connection with the post-conviction motion, Mr. Meyer portrayed Mr. Smith as a "sincere, truthful, persuasive young man . . . [who] would be an effective witness for the defense." (Brief for Respondent dated April 2002, attached as Exh. K to Gill Decl., at 46 (citing Meyer Affirmation dated March 2001, at 2).

In light of the new evidence that came to light at the hearing, the petitioner asked the Appellate Division to reconsider its decision, but the court declined to do so without comment.  People v. Smith, 4 A.D.3d at 165, 772 N.Y.S.2d at 35.

Because the record concerning Mr. Meyer's assessment of his client is both ambiguous and incomplete, a determination of whether the state court's decision was an unreasonable application of the Strickland standard is difficult and might require a further evidentiary hearing.  It is also unnecessary, however, in light of the recommendation that the writ be granted on other grounds.

    C.  Burden of Proof

    Finally, the petitioner asserts that the jury instruction given by the trial court violated due process by improperly shifting the burden to him to prove the absence of intent.  Mr. Smith argues that there is a reasonable probability that the jurors interpreted the jury instruction as allowing the consideration of his insanity only in connection with the affirmative defense, and precluded its use in determining whether he possessed the requisite intent to commit robbery.

    To prevail on a claim that a jury instruction was improper, the petitioner must prove that the charge not only misstated state law, but also that the violation denied him a right guaranteed by the Fourteenth Amendment.  Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) (citing Cupp v. Naughten, 414 U.S. 141, 146 (1973)).

Due process requires that the prosecution bear the burden of proof beyond a reasonable doubt for every essential element a crime for the entirety of the trial. <u>Francis v. Franklin</u>, 471 U.S. 307, 313 (1985).

The Appellate Division ruled that the "court's charge, when viewed as a whole, properly instructed the jury on the intent element of the charged crime and on the affirmative defense of insanity, including the proper burden of proof as to each of these issues." <u>People v. Smith</u>, 4 A.D.3d at 165, 722 N.Y.S.2d at 35. This is not an objectively unreasonable application of federal law.

The trial judge emphasized at the outset of his instructions that the burden of proof rested on the prosecution and "never shifts from the People to the defendant." (Tr2. at 66). The judge told the jury that the prosecution bore the responsibility for establishing beyond a reasonable doubt that the defendant committed the robbery intentionally and explained further that "a person acts intentionally with respect to conduct in which he engages when his conscious objective is to cause such result or engage in such conduct." (Tr2. at 81). The judge then encouraged the jury to consider Mr. Smith's conduct before, during, and after the crime in order to determine whether the prosecutor proved the element of intent. The petitioner has failed to demonstrate that these instructions steered the jury away from considering the evidence of Mr. Smith's insanity in connection with the element of intent

## Conclusion

For the reasons set forth above, I recommend that Mr. Smith's petition for a writ of habeas corpus be granted on the basis of his claim that the trial court violated his procedural due process rights by failing to order a competency inquiry. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, Room 620, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          July 6, 2006

Copies mailed this date to:

Richard M. Greenberg, Esq.
Office of the Appelate Defender
11 Park Place, Suite 1601
New York, New York 10007

22

Alyson J. Gill, Esq.
Assistant Attorney General
120 Broadway, 22nd Floor
New York, NY 10271